IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISON

| | | |
|---|---|---|
| LARRY D. STEWART, | ) | CASE NO.1:23-CV-02215 |
| | ) | |
| PETITIONER, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| | ) | |
| HAROLD MAY, Warden, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| RESPONDENT, | ) | |

## I.    Introduction

Petitioner Larry D. Stewart ("Stewart") filed a *pro se* habeas corpus petition ("Petition")
on November 4, 2023 pursuant to 28 U.S.C. § 2254 regarding his convictions for aggravated
murder, attempted murder, aggravated robbery, kidnapping, and having weapons while under
disability. (ECF Doc. 1).  This matter was referred to me for the preparation of a Report and
Recommendation. (ECF Doc. 3; non-document entry of Apr. 2, 2024). Respondent Warden
Harold May ("Respondent") filed a return of writ on February 20, 2024. (ECF Doc. 8). Stewart
filed his traverse[1] on July 8, 2024, making this case ripe for review. (ECF Doc. 14).

---

[1] As will be discussed in more detail below, this Court exercises its discretion to treat Stewart's
July 8, 2024 filing as a traverse.

1

II.     **Factual Background**

The Ohio Eighth District Court of Appeals summarized the facts of Stewart's convictions as follows:

> [Stewart's] convictions stem from an incident that occurred on the night of May 28, 1996. Since that day was the eighth birthday of Jewetta Roberts, daughter of Nathan Bell, one of the victims herein, Nathan had celebrated it with a number of family members at their home, an apartment in a building located at 3395 East 140th Street in Cleveland, Ohio.
>
> Nathan's family members present at the apartment by nightfall included the following: 1) his mother Jewetta; 2) his brother Tyrone, who was a quadriplegic; 3) his brother Kevin, who arrived at the apartment at approximately 9:15 p.m.; and 4) his sons "Little Nate," Jason and Christopher. Also present that night were Nathan's girlfriend Latasha and his friend Mark Turner.
>
> As Nathan was not scheduled to report to his place of employment until midnight, he decided to watch a televised basketball game with Tyrone in Tyrone's bedroom. Mark was also in the room, seated on Tyrone's bed.
>
> Upon his arrival at the apartment, Kevin informed Nathan's sons Little Nate and Jason that on his way he had stopped to order a sandwich from the restaurant located next door to the apartment building. Kevin asked the boys to retrieve it for him, and they agreed. He gave them some money, then proceeded to Tyrone's room to join his brothers and Mark.
>
> Outside the apartment, Little Nate and his brother went down the few steps to the security door in the lobby of the building. Little Nate was opening the security door when he saw Curtis Mitchell approaching. Since Little Nate knew Curtis was a relative of the family, he held the security door open to let Curtis inside the building. The youngsters then continued on their errand.
>
> Curtis entered the apartment through the unlocked front door, walking past the dining room at the front and into the short hallway, where he stopped and looked into Tyrone's bedroom. Curtis greeted the men inside, then proceeded to the other bedroom in the apartment, where Jewetta was watching her two other grandchildren as they played video games on the television. Curtis did not visit often; therefore, Jewetta thought his appearance that night was unusual. Curtis spoke with Jewetta briefly. As he was doing so, Latasha stepped into the dining room to begin ironing clothes; thus, she saw Curtis "standing in the hallway," and he passed her on his way out of the apartment.
>
> The two youngsters were returning from their errand just as Curtis was exiting the building. Before Little Nate went into his family's apartment, he observed Curtis "[p]utting paper in the [security] door" in order to prevent it from latching.

2

Little Nate then delivered the restaurant sandwich to Kevin, who took it into his mother's bedroom to eat it. By this time, Little Nate had become hungry himself, so he made a sandwich in the kitchen. Afterwards, he and Jason sat in the dining room to wait for Latasha to finish ironing clothes.

The three of them were surprised when the door to the apartment suddenly opened, striking Latasha as it did so. Two strange men strode into the entranceway; the men both held guns. One man, later identified as William Logan, continued down the hall, while the other, later identified as [Stewart], ordered Latasha and the two boys to "get down."

As Latasha obeyed, she watched [Stewart], concerned that he would fire the weapon he pointed at her. [Stewart] stated, "Don't look," so Latasha then covered her eyes with her arm.

Logan walked past the first bedroom and entered Jewetta's bedroom, where Kevin had just set down the remaining portion of his sandwich. Kevin looked up to see Logan "standing in front of me with a loaded 38-caliber handgun in my face." Logan demanded money. Kevin complied by handing Logan his wallet; however, since he knew it contained no currency, he began to plead with Logan to "let [his] mom out of this house."

In her fear at the sudden confrontation, Jewetta fumbled for her purse, declaring she would take Logan "to the ATM machine" because they had "no money here." Logan seemed disconcerted by this information. He ordered them to "[s]hut up" and motioned for them to leave the room.

Kevin pushed his mother in front of him as the two were followed out the door by Logan. As Kevin passed the other bedroom, he nudged the door open with his foot in order to apprise the men inside of what was occurring. Thus, Nathan, who had been watching television from a prone position on the floor of the bedroom, looked over at the doorway to see "a guy with a gun to [his] brother's head." Jewetta continued to the dining room, where upon seeing appellant, she lay down on the floor with the others.

Nathan leaped up and advanced toward the men. Logan turned the gun toward him, but at that moment, Kevin also turned toward Logan. The brothers "grabbed" at Logan's gun hand and pushed it toward the wall behind them. A struggle between the three ensued. Logan's gun fired during the fight for it; the bullet struck the rear door of the apartment.

When [Stewart] became aware of his partner's difficulty, he left the dining room to run down the hallway in a "crouched" position with his gun extended and "pointed." Just as appellant advanced, Mark Turner came to the bedroom doorway intending to aid his friends in their struggle for Logan's gun. [Stewart] fired his

3

weapon once; Mark said, "Oh," then "fell back" onto the bedroom floor. The bullet had struck him in the back and traveled through his heart, killing him almost instantly.

[Stewart] then fired his weapon again, striking Nathan in the leg and shattering the femur. Nathan "went down." [Stewart] stepped over Nathan, pointed the gun at each of the brothers, and ordered Kevin to "[g]et off [his] boy [Logan]." Kevin complied. The two gunmen then fled out the rear door.

By this time, Latasha and Jewetta also had escaped from the apartment. They summoned the police, who arrived within minutes. Nathan soon was transported to the hospital by emergency medical personnel. During their investigation of the incident, the police took photographs of the scene and interviewed the witnesses present.

Shortly after the incident had occurred, police officer Michael Belle received a telephone call from his cousin, Ernestine Bell, Jewetta's daughter. Belle's cousin informed him of what had transpired that evening. He proceeded to the apartment, spoke with Jewetta, then "went to look for Curtis Mitchell." Upon finding him, Belle convinced Curtis to accompany him to the Cleveland Police Department's Homicide Unit.

Curtis thereafter gave a written statement that identified Logan and [Stewart] by their "street names" as his partners in perpetrating the incident. Logan was arrested within approximately two weeks; however, the police were unable to apprehend [Stewart].

On June 27, 1996, the Cuyahoga County Grand Jury issued an indictment against [Stewart] and Logan, charging them on seven counts as follows: two counts of aggravated murder, R.C. 2903.01(A) and (B), with firearm, mass murder and felony murder specifications; one count of attempted murder, R.C. 2923.02/2903.02, with a firearm specification; two counts of aggravated robbery, R.C. 2911.01, with firearm specifications; and two counts of kidnapping, R.C. 2905.01, with firearm specifications. [Stewart] and Logan also each were indicted on a single count of having a weapon while under disability, R.C. 2923.13; [Stewart's] count contained both a firearm and a violence specification. The record reflects William Logan's case proceeded separately from [Stewart's].

On September 2, 1996, [Stewart] was arrested in Tacoma, Washington. [Stewart] waived extradition and was arraigned on September 24, 1996. He entered a plea of not guilty to the charges and was assigned counsel to represent him.

On October 14, 1996, Det. Moore, who was in charge of the investigation of the incident, went to the Bells' apartment with a photographic array consisting of twelve pictures. Asking each to choose those persons who "came into the house that night," Det. Moore showed the array separately to the following people:

Latasha, Jewetta, Nathan, Tyrone and Kevin. Latasha, Jewetta and Nathan all chose the photographs of Curtis, Logan and [Stewart] from the array. Tyrone chose Curtis and Logan. Kevin also chose Curtis and Logan; his identification of [Stewart], however, was not immediate and, therefore, Moore did not note it.

The record reflects that on April 7, 1997, after extensive discovery had been undertaken and [Stewart's] case was called for trial, appellant informed the trial court he was dissatisfied with counsel. The trial court discussed the matter and permitted [Stewart's] family to retain additional counsel but advised appellant that it would not permit assigned counsel simply to be dismissed; rather, they would assist retained counsel. [Stewart] raised no objection to this proposal.

Also prior to trial, the state requested a dismissal of count one of the indictment against [Stewart]. The trial court granted the motion and consequently renumbered the counts of the indictment against [Stewart]. Subsequently, the trial court also granted [Stewart's] motion to try the final count of the indictment to the bench.

Although [Stewart] requested the trial court to conduct a separate voir dire hearing on identification testimony of the state's witnesses prior to the commencement of trial, the trial court refused. The trial court stated its belief that, in view of the probable length of the trial, judicial economy would be better served by conducting a voir dire prior to the testimony of each identification witness.

[Stewart's] jury trial commenced on June 9, 1997. During its case-in-chief, the state presented the testimony of several members of the Bell family, some of the investigating police officers and forensics examiners, the assistant county coroner who had conducted Mark Turner's autopsy, and Curtis Mitchell. The state also introduced into evidence, inter alia, several photographs of the scene taken by the police on the night of the incident. The trial court further permitted the state to introduce evidence concerning [Stewart's] prior convictions.

[Stewart] presented the testimony of several witnesses and also testified in his own behalf. [Stewart's] defense was that of alibi: he stated he was with Nicole Garrett, the mother of two of his children, on the night of the incident. The trial court thereafter admitted [Stewart's] work records for the relevant time period into evidence.

On June 13, 1997, the jury found [Stewart] guilty on all counts with the specifications. Additionally, the trial court found [Stewart] guilty of the remaining count of having a weapon while under disability.

A mitigation hearing as to [Stewart's] conviction for aggravated murder, R.C. 2903.01(B), followed on September 3, 1997. At the mitigation hearing, [Stewart's] parents testified concerning [Stewart's] upbringing. [Stewart] then gave an unsworn statement. Subsequently, the jury recommended a sentence of life imprisonment without parole eligibility for thirty years.

> On September 4, 1997, the trial court sentenced [Stewart] to consecutive terms of incarceration as follows: three years on the firearm specifications, to be served prior to and consecutive with thirty years to life for the aggravated murder conviction; fifteen to twenty-five years for the convictions for attempted murder and each of the convictions for aggravated robbery and kidnapping; and three to five years for the conviction for having a weapon while under disability.

*State v. Stewart*, No. 73255, 1998 WL 811313, at *1-4 (Ohio Ct. App., Nov. 19, 1998)

("*Stewart I*"). These factual findings are presumed correct unless Stewart rebuts this

presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

## III.    Procedural History[2]

### A.    State Court Conviction

On September 30, 1997, Stewart was sentenced as follows:

> 30 YRS TO LIFE ON CT 1, DEFT TO SERVE 3 YRS ON FIREARM SPEC PRIOR TO IMPOSITION OF SENTENCE IN CT 1; 15 YRS TO 25 YRS ON CT 2, SENTENCE CONSECUTIVE TO CT 1; 15 YRS TO 25 YRS ON CT 3, SENTENCE CONSECUTIVE: TO CTS 1 & 2; 15 YRS TO 25 YRS ON CT 4, SENTENCE CONSECUTIVE TO ALL CTS; 15 YEARS TO 25 YRS ON CT 5, SENTENCE CONSECUTIVELY TO ALL OTHER CTS; 15 YRS TO 25 YRS ON CT 6, SENTENCE CONSECUTIVE TO ALL OTHER CTS; 3 YRS TO 5 YRS ON CT 7, CONSECUTIVE TO ALL OTHER CTS.

(ECF Doc 8-1, pp. 46-47).

### B.    First Federal Habeas Corpus Petition

Stewart filed a petition for a writ of habeas corpus on July 23, 2001. (*Stewart v. Russell*,

Case No. 1:01cv1785, ECF Doc. 1). This Court summarized the state court history following his

conviction as follows:

---

[2] Habeas Rule 5(c) and (d) require the respondent to attach relevant portions of the transcript, briefs, opinions, and orders to the answer. As will be discussed in more detail below, the relevant portions of the state court record related to the sentencing court's issuance of a nunc pro tunc entry and decision regarding alleged *Brady* material. The Respondent provided the portions of the record it deemed relevant as required by Rule 5 and Stewart has not challenged the adequacy of the record provided to the Court.

Stewart filed a timely notice of appeal of his convictions in the state appellate court. He raised four assignments of error in his appeal:

I.    THE TRIAL COURT ERRED IN ADMITTING PATENTLY UNRELIABLE EYEWITNESS IDENTIFICATIONS.

II.   FAILURE OF THE TRIAL COURT TO GIVE A REQUESTED JURY INSTRUCTION ON VOLUNTARY MANSLAUGHTER DENIED THE APPELLANT IS [sic] RIGHT TO FAIR TRIAL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENT [sic] OF THE UNITED STATES CONSTITUTUION.

III.  THE APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL GUARENTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY THE FAILURE OF DEFENSE COUSNEL TO MOUNT AN EFFECTIVE MITIGATION.

IV.   THE CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

Stewart later supplemented his appellate brief by adding four additional assignments of error:

ASSIGNMENT OF ERROR I.

The trial court abused it's discretion in denying the appellants motion for mistrial and suppression of State witness Kevin Bell, a violation of the Sixth and fourteenth amendment of the United States Constitution.

ASSIGNMENT OF ERROR II.

The trial court erred when refuseing the defense from useing the States crime scene photo-graphs for cross examination of identification witnesses, a violation of the fifth and fourteenth amedment of the United States Constitution.

ASSIGNMENT OF ERROR III.

The trial court erred in entering Judgements of conviction for aggravated-murder, 2-counts of aggravated robbery and 2-counts of aggravated kidnapping, which under the circumstances are allied offenses of similar import, a violation of the multiple count Status, Ohio Revised Code. § 2941.25.

ASSIGNMENT OF ERROR IV.

The trial court failed to give cautionary instructions on eye-witness testimony, which amounted to plain-error, a violation of the fifth and fourteenth amendment of the Uniterd States Constitution.

(Errors in the original.) On November 30, 1998 the state appellate court affirmed the judgment of the trial court.

Stewart did not file a timely notice of appeal in the Ohio Supreme Court. On March 20, 2000 he filed a motion for leave to file a delayed appeal pursuant to Ohio S. Ct. R. II, § 2(A)(4). The Ohio Supreme Court denied his motion on July 12, 2000.

On March 10, 1999 Stewart filed in the state appellate court an untimely application for a delayed appeal pursuant to Ohio App. R. 26(B). Stewart asserted five claims in his application:

I.      APPELLANT WAS DENIED EFFECTIVE ASSISTANCE ON DIRECT APPEAL.

II.     PROSECUTION KNOWLING USED PERJURED TESTIMONY.

III.    DEFENDANT WAS DENIED HIS SUBSTANTIAL RIGHT WHEN THE COURT PROCEEDED TO EXCUSE A JUROR AFTER JURY HAD BEEN IMPANLED IN WHICH WAS DONE WITH-OUT ANY QUESTIONING OF JUROR AFFECTED.

IV.     DEFENDANT WAS DENIED HIS SUBSTANTIAL RIGHT TO BE PRESENT AT THE HEARING CONCERNING EXCUSEING A JUROR.

V.      PROSECUTOR'S IMPROPER COMMENTS DURING REBUTTAL ARGUEMENTS WAS OF PLAIN-ERROR.

(Errors in the original.) On June 29, 1999 the court denied Stewart's application on the grounds that it was untimely. The court also found Stewart's claims barred by *res judicata*.

Stewart filed a notice of appeal in the Ohio Supreme Court on July 28, 1999. In his memorandum in support of jurisdiction, Stewart asserted five propositions of law:

PROPOSITION OF LAW NO: I
APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN HID DIRECT APPEAL, A VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

PROPOSITION OF LAW NO: II
THE PROSECUTION KNOWLING USED PERJURED TESTIMONY WHICH, DENIED APPELLANT OF DUE PROCESS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

PROPOSITION OF LAW NO: III
APPELLANT WAS DENIED HIS RIGHT WHEN THE COURT PROCEEDED TO EXCUSE A JUROR AFTER THE JUROR HAD BEEN IMPANELED IN WHICH WAS DONE WITH_OUT ANY QUESTIONING AFFECTED, IN

VIOLATION OF DUE PROCESS GUARANTEED BY THE UNITED STATES CONSTITUTION.

PROPOSITION OF LAW NO: IV
APPELLANT WAS DENIED HIS SUBSTANTIAL RIGHT TO BE PRESENT AT THE HEARING CONCERNING THE EXCUSING OF A JUROR, IN WHICH VIOLATED DUE PROCESS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

PROPOSITION OF LAW NO: V
PROSECUTOR'S IMPROPER COMMENTS DURING REBUTTAL ARGUEMENTS WAS OF PLAIN-ERROR DEPRIVING APPELLANT OF HIS RIGHT TO A FAIR TRIAL UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

(Errors in the original; emphasis altered from the original.) On September 29, 1999 the Ohio Supreme Court dismissed Stewart's appeal as not involving any substantial constitutional question.

On June 8, 1998, Stewart filed in the trial court a petition for postconviction relief pursuant to Ohio Rev. Code § 2953.21. Stewart asserted three assignments of error in his petition:

I.      Petitioner was denied effective assistance of counsel, where the omission of counsel to recognize and object to the amended chargeing terms of the indictment.
II.     The trial court abused it's discretion for allowing the petitioner to be held to answer and convicted of fact's not found by a grand jury.
III.    Prosecutorial Misconduct: prosecution knowling presented it's case with a material false impression and utilized perjured testimony.

(Errors in the original.) On July 20, 1998 the trial court dismissed the petition without opinion. Stewart filed on August 27, 1998 a motion for summary judgment and to supplement the appendix to his petition.

On December 22, 1998 Stewart filed in the appellate court a brief appealing the trial court's dismissal of his petition for postconviction relief. The court dismissed his appeal for lack of jurisdiction. The court noted that the trial court had not issued findings of fact and conclusions of law. The court found, therefore, that because a final, appealable order was not before the court, and the matter was not yet ripe for appeal. On March 10, 1999 the trial court issued findings of fact and conclusions of law related to its dismissal of Stewart's petition. The trial court found that all of Stewart's assignments of error were barred by *res judicata*.

On April 20, 1999 Stewart filed a second appeal of the denial of his petition for postconviction relief. Stewart asserted five assignments of error in his appeal:

I.     THE TRIAL COURT LACKED SUBJECT MATTER JURISDICTION TO AMEND THE INDICTMENT, DENYING APPELLANT OF DUE PROCESS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

II.    THE TRIAL COURT ABUSED IT'S DISCETION IN ALLOWING APPELLANT TO BE HELD TO ANSWER AND CONVICTED BY FACTS NOT FOUND BY A GRANDJURY, PURSUANT TO CRIM(R)(7)D), DENYING APPELLANT OF DUE PROCESS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

III.   PPELLANT WAS DENIED INEFFECTIVE ASSISTANCE OF COUNSEL'S IN THEIR FAILURE TO RECOGNIZE AND OBJECT TO THE AMENDMENT DENYING APPELLANT OF HIS RIGHTS TO THE SIXTH AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

IV.    THE TRIAL COURT ERRED IN DENYING APPELLANT AN EVIDENTIARY HEARING, DEPRIVEING HIM OF DUE PROCESS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSITUTION.

V.     THE TRIAL COURT ERRED IN ADOPTING VERBATIM THE STATES MEMORANDUM CONTRA, DENYING APPELLANT OF DUE PROCESS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

(Errors in the original.) On June 26, 2000 the state appellate court affirmed the judgment of the trial court. The court found all of Stewart's assignments of error to be without merit and also found that the first two assignments of error were barred by *res judicata*.

On August 21, 2000 Stewart filed in the state appellate court a motion for relief from judgment pursuant to Ohio R. Civ. P. 60(A). The state appellate court dismissed his motion without opinion on September 12, 2000.

On April 18, 2001 Stewart filed in the trial court a second petition for postconviction relief. The trial court dismissed this petition without opinion on August 16, 2001.

On October 2, 2001 Stewart filed a second application to reopen his direct appeal pursuant to Ohio App. R. 26(B). On November 2, 2001 the court of appeals denied his application, noting that there is no right to file a successive application to reopen an appeal.

(*Id.* at ECF Doc. 81 pp. 6-12).

10

After amending his petition, Stewart raised the following grounds for relief in his first

habeas petition:

**GROUND ONE:**
Petitioner Stewart was denied his due process rights guaranteed by the Fourteenth Amendment of the United States Constitution by the admission at trial of unreliable eyewitness identification testimony.

**Supporting Facts:**
All of the victim-witnesses briefly looked at the shooter while under stressful conditions. The in-court identifications were twelve (12) months after the incident, before which no prior descriptions were produced.

**GROUND TWO:**
Petitioner Stewart was denied the effective assistance of appellate counsel as guaranteed by the Fourteenth Amendment of the United States Constitution.

**Supporting Facts:**
Appellate counsel failed to challenge the constitutionality of an "obvious error" that could have affected the outcome of Petitioner's direct appeal. That omission resulted in a deficient performance which prejudiced Petitioner.

**GROUND THREE:**
The prosecution violated Petitioner Stewart's Fourteenth Amendment right to due process by withholding exculpatory evidence that would have discredited eyewitness identification testimony.

**Supporting Facts:**
The prosecution withheld police reports that contained eye witness statements contrary to the witness' trial testimony. Prosecution eyewitnesses [K]evin Bell, Jewetta Bell, and Natasha Jameison gave identifying accounts and statements to police after the offense and closer in time to the event than the trial. These statements by the witnesses contradict the testimony given by each at trial regarding the identification of the principal shooter.

**GROUND FOUR:**
The prosecution violated Petitioner Stewart's Fourteenth Amendment right to due process by knowingly using perjured testimony to secure Petitioner Stewart's conviction.

**Supporting Facts:**
The withheld report contains a circumstantial chain of contradictions that indicates the prosecution knowingly allowed a police officer to testify falsely that he observed eyewitnesses identify petitioner from a photo array as the shooter when in fact he had not.

11

(*Id.* at ECF Doc. 73).

This Court dismissed the petition on July 29, 2009, finding that Stewart had procedurally defaulted each of his four grounds for relief. (*Id.* at ECF Doc. 87).

### C.    Subsequent Post-Conviction Proceedings

On January 2, 2014, Stewart, filed a pro se writ of mandamus in Ohio's Eighth District Court of Appeals seeking to "compel Court of Common Pleas Judge Michael J. Russo to issue a final appealable order consisting of both a sentencing opinion pursuant to R.C. 2929.03(F), and the judgment of conviction pursuant to RC 2505.02." (*Id.* at pp. 48-67). Judge Russo moved for summary judgment on Stewart's writ of mandamus. (*Id.* at pp. 69-78). The Eighth District Court of Appeals granted Judge Russo's motion on February 18, 2015 and denied the writ. (*Id.* at p. 79-85).

Stewart appealed the denial, *pro se*, to the Ohio Supreme Court on March 18, 2015. (*Id.* at pp. 87-93). Stewart raised the following proposition of law: "The Court of Appeals erred in dismissing Stewart's complaint for Writ of Mandamus as the facts supporting the Writ prove he was entitled to relief." (*Id.* at p. 95). Judge Russo opposed the appeal on July 7, 2015. (*Id.* at pp. 123-34). The Ohio Supreme Court affirmed the appellate court's decision on February 9, 2016. (*Id.* at p. 135).

While the writ of mandamus was pending, Stewart filed a "Motion for Final Appealable Order and Resentencing Pursuant to R.C. 2929.03(F), And Ohio Criminal Rule 47" with the sentencing court on April 14, 2014. (*Id.* at pp. 136-43). The state of Ohio opposed the motion. (*Id.* at pp. 148-54). The sentencing court denied Stewart's motion on July 11, 2014. (*Id.* at p. 155). On August 15, 2017, Stewart, through counsel, filed a motion for leave to file a motion for a new trial. (*Id.* at pp.157-71). In the motion, Stewart asserted that following his trial and appeal

12

in November 1999, he made a public records request to the Cleveland Department of Public Safety. (*Id.* at pp. 164-65). Through this public records request, Stewart obtained "access to supplemental police reports relating to the homicide investigation" that "could have been favorably used at trial[.]" (*Id.* at p. 165). Stewart argued he was entitled to a new trial because he "had no knowledge of the existence of the exculpatory evidence due to the fact that the prosecutor withheld the evidence" and that he "exercised reasonable diligence in obtaining the exculpatory evidence." (*Id.* at p. 161). Stewart further asserted that these reports were the basis of an April 18, 2001 second petition for post-conviction relief[3] in which he asserted prosecutorial misconduct for withholding the reports, but the sentencing court "denied the petition without mailing [Stewart] a copy of the judgment entry." (*Id.*). As such, the reports were being used as "grounds for leave to file a motion for new trial." (*Id.*).

The state of Ohio opposed Stewart's motion. (*Id.* at pp. 172-82). The state of Ohio argued that Stewart was not entitled to leave because he "raised this claim in his 2001 petition for postconviction relief" which the trial court denied and also raised it "in a 2006 motion for leave to file a motion for new trial." (*Id.* at p. 180). Therefore, according to the State, Stewart failed to satisfy Ohio Criminal Rule 33. (*Id.*). The sentencing court denied Stewart's motion for leave on September 29, 2017. (*Id.* at p. 183). Stewart did not appeal this decision.

On June 19, 2019, Stewart, filed a pro se Motion to Vacate a Void Sentence, requesting the trial court to "vacate his thirty to life sentence for Aggravated-Murder as it[']s not authorized by law where the Court imposed a sentence different from the one recommended by the jury." (*Id.* at p. 184-95). The state of Ohio opposed the motion. (*Id.* at pp. 196-205). The motion was

---

[3] Neither this petition, nor a first petition for post-conviction relief were included in the state court history attached to the return of writ. The petitions also cannot be accessed through Cuyahoga County's online docket.

13

denied on January 21, 2020. (*Id.* at p. 206). Stewart filed a timely appeal to the Ohio Eighth

District Court of Appeals on February 14, 2020. (*Id.* at pp. 207-19). In his *pro se* appellate brief,

Stewart raised the following three assignments of error:

> **1.** The trial-court erred as a matter of law in sentencing Appellant to an unauthorized term of thirty years to life for aggravated murder with specifications, instead of the statutorily mandated term of life imprisonment with parole eligibility after thirty full years.

> **2.** The trial-court erred as a matter of law in denying appellant's motion to vacate a void sentence where the sentence for aggravated murder does not contain the correct prison term mandated by R.C. 2929.03(D)(2), and State ex rel. Stewart v. Russo, 2016-Ohio-421.

> **3.** The trial-court erred as a matter of law by imposing one sentence in open court and journalized a different sentence outside the Appellant's presence in violation of Crim.R. 43(A), and his right to due process.

(*Id.* at p. 222). The state of Ohio filed its appellate brief on July 8, 2020. (*Id.* at pp. 239-

49). Stewart filed a *pro se* reply brief. (*Id.* at pp. 250-57).  The appellate court affirmed

the trial court's denial. (*Id.* at pp. 258-61).

On April 1, 2021, Stewart filed a *pro se* "Motion to Correct Sentencing Journal

Entry Pursuant to Crim.R. 36" requesting the trial court to issue a nunc pro tunc entry to

"accurately reflect[] the original sentence imposed at the sentencing hearing." (*Id.* at pp.

262-72). The state of Ohio responded to the motion on April 27, 2021. (*Id.* at pp. 273-78).

On April 29, 2021, the sentencing court issued a "nunc pro tunc entry as of and for

09/04/1997" which "change[d] the sentencing to: defendant sentenced to . . . life

imprisonment with parole eligibility after serving 30 full years of imprisonment." (*Id.* at

p. 279). Stewart field a timely notice of appeal with the Ohio Eighth District Court of

Appeals on May 28, 2021. (*Id.* at pp. 282-90). Stewart raised the following two

assignments of error in his *pro se* appellate brief:

14

1. The trial court erred when it used a nunc pro tunc order to resentence Appellant without his presence in violation of due process as guaranteed by the Fourteenth Amendment to the United[] States Constitution and Ohio Criminal Rule 43.

2. The trial court erred in using a nunc pro tunc order to resentence Appellant to a term of imprisonment for Count One, without credit for the time served, a violation of the Fif[th]and Fourteenth Amendment[s] to the United States Constitution.

(*Id.* at p. 293). The state of Ohio filed its appellate brief on September 21, 2021. (*Id.* at pp. 308-21). Stewart filed a *pro se* reply brief on December 1, 2021. (*Id.* at pp. 326-35). The appellate court affirmed the trial court's issuance of a nunc pro tunc on April 21, 2022 ("*Stewart II*"). (*Id.* at pp. 337-42). Stewart appealed to the Ohio Supreme Court on May 21, 2022, raising the following propositions of law:

> Proposition of Law No. 1:
> Appellant was denied due process when the Cuyahoga County Common Pleas Court used a nunc pro tunc order to resentence him without his presence, in violation of the Fourteenth Amendment to the United States Constitution and Ohio Criminal Rule 43(A).

> Proposition of Law No. 2:
> Appellant was denied due process when the Cuyahoga County Common Pleas Court used [a] nunc pro tunc order to resentence[] him to a new term of imprisonment for count one without credit for time served, a violation of the Fifth and Fourteenth Amendment to the United States Constitution.

(*Id.* at pp. 343-60). The Ohio Supreme Court declined to accept jurisdiction on August 16, 2022. (*Id.* at p. 361).

### D.    The Instant Petition

In the instant Petition, Stewart raises the following two grounds for relief:

**GROUND ONE:**
The State of Ohio's failure to disclose to the defense, prior to and during trial, Supplemental Investigative Reports written by the lead investigative detective, which contradicts his testimony that three witnesses' identified petitioner from a photo-array as their assailant, violated his due process rights under the <u>Fourteenth Amendment of the United States Constitution as recognized in Brady v. Maryland.</u>

**Supporting Facts:**
The State failed to turn over the testifying Police Detective's "Supplemental Investigative Reports" which contained detailed interviews of the State's primary witnesses and narratives of the Homicide Investigation. The Police Detective was the only agent of the State who showed a photo array to the victim-witnesses. However, documents from the undisclosed Report[s] directly contradict the Police Detectives corroboration testimony that three of the victim-witnesses identified petitioner from a photo array as their assailant. The undisclosed reports were favorable to petitioner because defense counsel could have used them to cross-examine the police detective who trial testimony was in stark contrast with facts recorded in his reports.

Despite the State's discovery response statement that "no exculpatory material was available to or in the possession of the Prosecuting Attorney", or the Police Detective's statement during cross-examination that he destroyed his reports, the investigative reports in question were in "exclusive control of the police". The undisclosed reports reflect the victim-witness in court identifications of petitioner was tainted by impermissible identification procedures. The police detective's written reports contained impeachment evidence reflecting the detective did not show the victim-witnesses a photo-array as claimed at trial, and witnesses' interviews show they told the police immediately after the crime occurred they could not identify either gunmen because their faces were covered, describing the suspect as wearing a hood pulled up tight to his face.

The testifying detective's reports are "material["] because it would have undermined his testimony which was the foundation for the admissibility of the eye witness identification evidence that directly linked petitioner to the shootings.

On June 13, 1997, a jury in the Cuyahoga County Court of Common Pleas convicted petitioner of Aggravated-Murder, Attempted-Murder, Aggravated-Robbery, Kidnapping, and having a weapon while under disability. Petitioner and two others allegedly raided an apartment and attempted to rob the occupants. A struggle ensued in which on one of the occupants was fatally shot, and another was shot and wounded as the second gunman attempted to escort two of the other occupants out the door to force them to withdraw money from an ATM machine. Prior to trial, defense counsel requested the trial-court to conduct a "voir dire hearing" on the State witnesse[s'] identification testimony. At the voir dire hearing Detective Robert Moore testified that on October 14, 1996, five months after the crime occurred, he showed Natasha Jamison, Nathan, and Jewetta Bell a 12-picture photo array. Detective Moore testified that all four-witnesses selected petitioner's photo as their assailant. The trial-court denied petitioner's motion to suppress the victim- witnesse[s'] identification, ruling their identification was neither the result of an impermissible suggestive confrontation nor unreliable.

On June 9,1997, the case proceeded to a jury trial, petitioner was found guilty of aggravated-murder, attempted-murder, aggravated-robbery, kidnapping, and

having a weapon while under disability. After petitioner's conviction and sentence were affirmed on direct appeal and his initial post-conviction petition were denied, he made a written Ohio Public Records request to the Cleveland Department of Safety. In November 1999, the Cleveland Department of Public Safety released records consisting of the original incident reports and supplemental investigative reports regarding the "Mark Turner" homicide investigation. The records released contained May-July 1996, witness interviews and narratives of the homicide investigation. Detective Robert Moore, a homicide detective with the Cleveland Police Department wrote the reports at issue, a review of the reports shows during the initial stages of the investigation police detectives obtained a written statement from co-conspirator Curtis Mitchell which incorporated his photo identification of petitioner.

How-ever, the same procedure used when interviewing Mitchell was not followed when the police interviewed victim-witnesses without showing them a photo-array or documenting a written record of their pre-trial photo identification. In fact, Det. Moore's reports were in stark contrast with his trial testimony whereas his reports reflect that Moore relied on Mitchell's photo identification of petitioner, not the victim-witnesses. In addition, Det. Moore's reports contain[] police interviews of Natasha Jamison in which she stated: "she could not identify either gun-men because their faces were covered". During Kevin Bell's interview he described the triggerman as "having a hood pulled up tight over his face". In October of 2022, petitioner's family retained private investigator Marin D. Yant, who also made a Records Request to the Cleveland Police Department and the Cuyahoga County Prosecutor's Office. Due to the multitude of documents received, including the original incident reports, supplemental reports, and a case file totaling hundreds of pages, petitioner alleges the State committed several Brady violations.

**"A Brady Prosecutorial Misconduct claim has Three Elements"**
1). The first element, the undisclosed investigative reports are favorable because it could have been used to impeach detective Moore's testimony and the State's primary witnesse[]s who directly li[n]ked petitioner to the shootings. The reports show Det. Moore interviewed the victim-witnesses without showing them a photo-array, and Moore was told by the victim-witnesses that they did not see the gray-hooded gunman's face. Petitioner's counsel was unable to cross examine Det. Moore on either of these points. In addition, Natasha Jamison, Nathan and Kevin Bell's interviews are favorable because it could have been used to impeach their trial testimony. Immediately after the crime, witnesses provided police with accounts and physical descriptions that contradict their trial testimony. The undisclosed reports are favorable because it contains impeachment evidence that has direct bearing on the credibility of the State primary witnesses.

**Cause and Prejudice in this Case parallel the Second and third of Three Brady Components. "Banks v. Dretke,"540 U.S. 691.**
2). Corresponding to the second Brady element ------- that the State Suppressed the Supplemental Investigative Reports at issue ------- Petitioner shows cause because

17

the reason for his failure to raise his Brady claim in State Court was the State's Suppression of the relevant evidence. Petitioner, through counsel made several pre-trial request[s], including a request for any exculpatory evidence. In its response, the State identified 25-non police witnesses by name and address, including Natasha Jamison, Nathan and Kevin Bell. The State did not produce any statements or interviews from these witnesses despite defense counsel's request. How-ever, the State indicated [i]n its response to trial-counsel's request that "*no exculpatory material was available to or in its possession*". In addition, the undisclosed reports had not been provided during trial when counsel made a request for an in camera inspection of Det. Moore's reports. On cross-examination, defense-counsel asked Moore for his reports, in which Moore stated: "*he destroyed his reports*". It is undisputed the reports were in the "*exclusive control*" *of the Cleveland Police Department until released via a records request*. In contrast, Detective Moore's false statements that he destroyed his Reports amounts to the type of prosecutorial concealment and misrepresentation found in Bank's case. See (***Prosecutor's discovery response statement, and transcript of det. Moore's testimony***). Likewise, the Sixth Circuit has held that "prosecutorial concealment" and ["]misrepresentation" was key to the Bank[]s holding and rejected a petitioner's argument that the prosecutions withholding of documents alone, i.e., without prosecutorial misconduct, demonstrates cause. <u>Cone v. Bell</u>, 492 F.3d at 754, )6th Cir.2007). Since the State misleadingly represented that it had no exculpatory material in its possession and allowed Det. Moore's testimony to go uncorrected, the State's suppression of Detective Moore's Investigative Reports prevented petitioner from raising his Brady claim in State Court.

<u>Materiality, Suppressed Evidence Prejudice Petitioner</u>
3). The third element at issue-------- prejudice ensued because the undisclosed investigative reports qualifies as "material" when there is any reasonable likelihood it could have affected the judgment of the jury. <u>Wearry v. Cain</u>. The undisclosed investigative reports strike at the heart of the State's case in directly contradicting Det. Moore, Kevin Bell, Nathan Bell, and Natasha Jamison's trial testimony. With such key witnesses impeached, there was a reasonable probability that a jury may disbelieve their testimony of identifying petitioner from a photo array as the triggerman for both shootings. <u>Smith v. Cain</u>, 535 U.S. 73 (2012). Petitioner's Brady claim rest[s] on five items from the undisclosed reports: 3-interviews of Natasha, Nathan, and Kevin; 2- written narratives by Det. Moore:

1). During interview with Natasha Jamison, she told Detectives that "*she could not ID either gunmen because their faces were covered*". Natasha's interview impeaches he[r] trial testimony [t]hat she was positive in her selection of petitioner's picture from a photo array.

2). The interview of Kevin Bell indicates he told Detectives the triggerman had a "*<u>hood pulled up tight to his face" and that the triggerman was 5'8, 140 lbs</u>*. Kevin's interview impeaches his trial testimony that he was positive in his selection of petitioner's picture from a photo array, in particular since Kevin made a surprise

identification of petitioner at trial, and since his description of the suspect is dissimilar to petitioner's actual appearance, (6'3,170 lbs.).

3). The interview of Nathan Bell shows he told detectives a different version of the shooting then the account he gave at trial. Nathan told detectives ["]the black hooded gunmen shot him in the leg", and that the gray hooded gunman shot Turner as he tried to aid Nathan in subduing the black hooded gunmen. Nathan's interview impeaches his trial testimony and the _State's theory the "gray hooded gunman was the sole triggerman for both shootings"._

The essence of the State's case was the testimony of the victim-witnesses, who identified petitioner as their assailant. Disclosure of their interviews would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense. Kyles, 514 U.S. at 441. The State's primary witnesses' trial testimony would have been severely undermined by use of their interviews. In contrast, Detective Moore was the only agent of the State who showed the photo array to the identifying witnesses. Det. Moore was a witness to the pretrial identification, therefore, Moore's testimony was critical in determining the admissibility of the witnesses identification testimony. The State would be unable to establish petitioner's guilt beyond a reasonable doubt as Det. Moore's testimony would be required for a conviction.

How-ever, the undisclosed reports undermined Det. Moore's corroboration testimony that three of the four victims-witnesses identified petitioner from the photo array as their assailant. Written narrative statements from the undisclosed reports show:

1). Det. Moore interviewed the victim-witnesses without showing them a photo-array.

2). Det. Moore made comments that "there were complexities surrounding the correct identity of the gray hooded suspect".

3). The undisclosed reports show police detective's failure to follow the same procedure used when interviewing and showing photo-array to co-assailants, in comparison to just interviewing the victim-witnesses; no written record of witnesses pre-trial interviews or statements identifying petitioner from a photo array. Defense counsel could have used the reports to argue Det. Moore relied on the co-assailant's photo identification of petitioner instead of victim-witnesses.

4). Police interviews show that victim witnesses[] told Det. Moore they did not see the "gray hooded gunmen's face". Defense counsel could have used the reports to argue the pre-trial photo identification of petitioner was "tainted by police misconduct: it was: "impermissibly suggestive" for police to show witnesses a photo-array which included the arrested suspect's picture five months after the crime occurred when the victim-witnesses told police detectives they did not see

the suspect's face, and witnesses[] physical description of the suspect was dissimilar to petitioner's actual appearance.

The five-documents from the undisclosed reports were material because it has direct bearing on the State's identification witnesses[]. The reliability of the four victim-witnesses' identification was the crux of the State's case, the effective impeachment of three of the four witnesses' testimony is sufficient enough to put the whole case in such a different light as to undermine confidence in the verdict.

In this case, "cause and prejudice parallel two of the three components of the alleged Brady violation itself", with the suppressing evidence resulting in prejudice. _Strickler v. Greene_, 527 U.S. 263; _Hughbanks v. Hudson_, 2 F. 4th 527, 539-43 (6th Cir. 2021). Here, all the components of a "true Brady violation" were indeed present in this case. Therefore, petitioner's procedural default should be excused.

**GROUND TWO:**
Petitioner was denied protections against double jeopardy when the Cuyahoga County Common Pleas Court resentenced him to a new term of imprisonment for Count One Aggravated-Murder without credit for the time served, a violation of the [F]ifth and Fourteenth Amendment[s] to the United States Constitution.

**Supporting Facts:**
On September 4, 1997, the trial-court orally sentenced petitioner to life imprisonment with parole eligibility after thirty-years. How-ever, the trial-court failed to journalize the sentence out of that hearing. Instead, it journalized a statutorily unauthorized 30-years to life sentence on Count 1, aggravated-murder with capital specifications. See (jdmt. ent., Line: 15).

Twenty-four years later, on April 1, 2021, petitioner filed a motion to correct the sentencing journal entry pursuant to Ohio Criminal Rule 36, requesting the trial-court to issue a nunc pro tunc sentencing journal entry so that it accurately reflects the original sentence imposed at the sentencing hearing. On April 29, 2021, the trial-court entered a nunc pro tunc order in which it corrected petitioner's sentence for aggravated-murder with capital specifications; the order changed the sentence from an unauthorized 30-years to life, to the statutorily correct term of "life imprisonment with parole eligibility after serving 30-full years".

At the time of his resentencing on April 29, 2021, petitioner had served 24-years of incarceration under the original sentence of 30-years to life, how-ever, the State Court's nunc pro tunc order did not credit petitioner within the time already served towards his new sentence. The nunc pro tunc correction vacated the original sentence and imposed a new sentence for the same underlying conduct without credit for the time already served on Count 1. Therefore, petitioner is entitled to have the time served credited toward the new sentence.

**IV.     Federal Habeas Corpus Standard of Review**

AEDPA applies to Stewart's petition for writ of habeas corpus. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). "As amended by AEDPA, 28 U.S.C. § 2254 sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). This is so because "[s]tate courts are adequate forums for the vindication of federal rights" and AEDPA thus acts as a "formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). As such, AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (internal citation and quotation omitted).

Under 28 U.S.C. § 2254, federal courts may "entertain only those applications alleging that a person is in state custody 'in violation of the Constitution or laws or treaties of the United States'" and in most instances, federal courts may not grant habeas relief "unless . . . the applicant has exhausted state remedies." *Cullen*, 563 U.S. at 181, quoting 28 U.S.C. §§ 2254(a), (b), (c). Further, if an application for writ of habeas corpus involves a claim that was "adjudicated on the merits in State court proceedings," the application

> shall not be granted . . . unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *Cullen*, 563 U.S. at 181; *Harrington v. Richter*, 562 U.S. 86, 100 (2011); *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007). The burden of proof rests with the petitioner. *Cullen*, 563 U.S. at 181.

21

First, clearly established federal law for purposes of AEDPA review includes "the holdings, as opposed to dicta, of [U.S. Supreme Court] decisions." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is contrary to U.S. Supreme Court precedent if the state court arrives at a conclusion opposite that reached by the Court on a question of law or if the state court decides a case differently than the Court despite both cases having materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *White v. Mitchell*, 431 F.3d 517, 523 (6th Cir. 2005), *cert. denied*, 549 U.S. 1047 (2006). However, a state court does not act contrary to clearly established federal law where U.S. Supreme Court precedent is ambiguous or otherwise unavailable. *See, e.g., Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

A state court decision is an unreasonable application of Supreme Court precedent where the state court's adjudication was "objectively unreasonable" and not merely erroneous or incorrect. *Williams*, 529 U.S. at 409-11; see also *Machacek v. Hofbauer*, 213 F.3d 947, 953 (6th Cir. 2000), *cert. denied*, 531 U.S. 1089 (2001). Under § 2254(d)(2), a state court's factual determination will stand unless it is objectively unreasonable in light of the evidence presented in state court. *Harrington v. Richter*, 562 U.S. 86, 100 (2011). "[A] federal habeas court may not grant relief simply because it concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 365.

Next, "a determination of a factual issue made by a State court shall be presumed to be correct. [Petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2554(e)(1). And, as the U.S. Supreme Court has repeated, "a state court factual determination is not unreasonable merely because the federal habeas court

would have reached a different conclusion . . . ." *Burt*, 571 U.S. at 18. Federal courts must also defer to a state court's judgment on issues of state substantive and procedural law. *Murray v. Carrier*, 477 U.S. 478, 491 (1986); *Engle v. Isaac*, 456 U.S. 107, 128-29 (1982).

In all, federal habeas corpus relief is a "guard against extreme malfunctions in the state criminal justice systems," and is different in kind from the relief available in direct appeal. *Harrington*, 562 U.S. at 102-03; *see also Brown v. Davenport*, 596 U.S. 118, 133 (2022) (internal quotation omitted). Thus, to obtain "habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

When a properly presented federal constitutional claim was not adjudicated on the merits in the state courts, the reviewing federal court must apply the pre-AEDPA standard, reviewing de novo questions of law and mixed questions of law and fact. *Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007) ("When the state court has not assessed the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply.").

## V.      Procedural Barriers to Federal Habeas Corpus Review

Before coming to federal court, a state habeas petitioner must overcome certain procedural barriers, including exhaustion of state remedies and procedural default. *See Daniels v. United States*, 532 U.S. 374, 381 (2001). A federal court sitting in habeas review may review claims that were evaluated on the merits by the state court. But claims that were not evaluated by a state court, either because they were never fully presented to the state court (*i.e.*, state court remedies were unexhausted) or because they were not properly presented to the state court (*i.e.*, they are procedurally defaulted) are not available for federal habeas corpus review. *Bonnell v.*

23

*Mitchel*, 301 F. Supp. 2d 698, 722 (N.D. Ohio 2004), *aff'd sub nom. Bonnell v. Mitchell*, 212 F.

App'x 517 (6th Cir. 2007).

### A.    Exhaustion

A petitioner must first give the state courts a "*fair*" opportunity to act on his claims.

*O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999) (emphasis in original). For a claim to have

been fairly presented, the factual and legal basis of the claim asserted by the petitioner must have

been raised at each and every stage of state review. *Wagner v. Smith*, 581 F.3d 410, 418 (6th Cir.

2009); *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). It is not enough for the claim

raised in state court to be "somewhat similar" to the one raised in the habeas petition or implicate

the same facts; the state court must have been called upon to apply the legal principles of the

claim now presented to the federal courts. *Jalowiec v. Bradshaw*, 657 F.3d 293, 304 (6th Cir.

2011).

The petitioner also must have presented their "claim to the state courts as a federal

constitutional issue – not merely as an issue arising under state law." *Williams*, 460 F.3d at 807

(quotation marks omitted). In this Circuit, this can be done in one of four ways:

(1) reliance upon federal cases employing constitutional analysis;

(2) reliance upon state cases employing federal constitutional analysis;

(3) phrasing the claim in terms of constitutional law or in terms sufficiently
     particular to allege a denial of a specific constitutional right; or

(4) alleging facts well within the mainstream of constitutional law.

*McMeans*, 228 F.3d at 681 (paragraph breaks added).

Failure to exhaust occurs where state court remedies are still "available at the time of the

federal petition." *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). This failure to

exhaust can also lead to a petitioner procedurally defaulting his claims. If the petitioner has not

24

fully utilized his state remedies and has no legal mechanism by which to do so now, the claim he failed to present is procedurally defaulted, and this Court cannot act on the claim either. *See Gray v. Netherland*, 518 U.S. 152, 161-62 (1996); *Williams v. Anderson*, 460 F.3d 789, 809 (6th Cir. 2006).

### B.      Procedural Default

The procedural default doctrine limits federal review if the petitioner has failed to follow the state's procedural requirements for presenting his or her claim in state court. *See Coleman v. Thompson*, 501 U.S. 722, 732 (1991). This doctrine flows from the insight that courts must have the authority to insist that "defendants present their arguments on time and according to established procedures." *Benton v. Brewer*, 942 F.3d 305, 307 (6th Cir. 2019). Thus, a federal habeas court will not consider a habeas petition if "the last state-court judgment denying relief on the claim rests on a procedural state-law ground that is 'independent of the federal question and is adequate to support the judgement.'" *Lovins v. Parker*, 712 F.3d 283, 295 (6th Cir. 2013) (quotation marks omitted).

This Circuit consults a four-part test to determine whether a petitioner has procedurally defaulted a claim. A petitioner procedurally defaults a claim if: (1) the petitioner fails to comply with a state procedural rule; (2) the state courts enforced the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) the petitioner cannot show cause and prejudice excusing the default. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

Because the procedural-default bar to federal habeas review is harsh, courts have created safety-valves to permit review in limited circumstances. A petitioner can obtain review of procedurally defaulted claims if he or she shows: (1) "cause," *i.e.* that some external factor kept

25

him from complying with the state rule or fairly presenting his claim; and (2) "prejudice," *i.e.* that, assuming the petitioner's constitutional claim has merit, there is a reasonable probability that a different verdict would have resulted if the alleged constitutional violation hadn't occurred. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Wogenstahl v. Mitchell*, 668 F.3d 307, 337 (6th Cir. 2012). A petitioner can also obtain review of a procedurally defaulted claim if the procedurally defaulted claim is based on new evidence that the petitioner was factually innocent of the crime of conviction. *See Coleman*, 501 U.S. at 750 ("fundamental miscarriage of justice" exception to procedural default); *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (A "fundamental miscarriage of justice" can occur only when the procedurally defaulted claim would establish that the petitioner was "actually innocent."). But "[A]ctual[] innocen[ce]" means "factual innocence, not mere legal insufficiency."; *Bousley v. United States*, 523 U.S. 614, 623 (1998). To overcome procedural default, an actual innocence claim must be supported by "new reliable evidence . . . that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

## VI.     Discussion

### A.     Second or Successive Habeas Petition

"The Antiterrorism and Effective Death Penalty Act [("AEDPA")] limits the authority of the federal courts to grant relief to individuals who previously filed a habeas petition." *In re Stansell*, 828 F.3d 412, 414 (6th Cir. 2016) citing 28 U.S.C. § 2244(b). If a petition is "second or successive," petitioners are required to seek authorization from a federal court of appeals before filing their petition with the district court. Id.; 28 U.S.C. § 2244(b)(3)(A).

However, "it is well settled that the phrase [second or successive] does not simply 'refe[r] to all § 2254 applications filed second or successively in time[.]'" *Magwood v. Patterson*, 561 U.S. 320, 332 (2010), quoting *Panetti v. Quarterman*, 551 U.S. 930, 944 (2007). Accordingly,

the Supreme Court has reasoned that because a federal habeas petitioner "'seeks invalidation . . .

of the judgment authorizing [his or her] confinement'" a petition filed as a result of an

intervening judgment from the sentencing court may be second in time but not second or

successive. *Magwood*, 561 U.S. at syllabus, quoting *Wilkonson v. Dotson*, 544 U.S. 74, 83

(2005). "[W]here . . . there is a 'new judgment intervening between the two habeas petitions,' . . .

an application challenging the resulting new judgment is not 'second or successive' at all."

*Magwood*, 561 U.S. at 341-42 (2010), quoting *Burton v. Stewart*, 549 U.S. 147, 157 (2007).

It is undisputed that the Petition at bar is Stewart's second in time habeas petition. (ECF

Doc. 1, p. 4). As stated above, Stewart first filed a federal habeas petition in 2001. Thus, the

question becomes whether the sentencing court's April 29, 2021 nunc pro tunc entry constitutes

a new intervening judgment that would not require appellate court approval before Stewart filed

the Petition. For the reasons detailed below, I find that the instant Petition is not second or

successive and therefore recommend the District Court proceed with habeas review.

Stewart argues that his Petition is not second or successive as follows:

> Petitioner contends his current habeas petition was not second or successive
> because his prior habeas petition challenged his previous 1997 judgment and he
> now challenges the new 2021 judgment issued after resentencing. See <u>*Burton v.
> Stewart*</u>, 549 U.S. 147 (2007) (sentence is the judgment). The 2021 nunc pro tunc
> change of sentence on the aggravated-murder Count resulted in a lengthier sentence
> than the sentence journalized in its original 1997 sentencing entry. See
> (attachments). Therefore, petitioner argues his 2023 petition was not a second or
> successive because his 2021 resentencing resulted in not just a new sentence, but
> rather a new judgment. See <u>*King v. Morgan*</u>, 807 F.3d 154 (6th Cir. 2015).

(ECF Doc. 1, p. 4).

Respondent disagrees, arguing that Ground One requires appellate court approval prior to

being considered "because [Stewart] already raised it in his prior habeas petition in this court."

(ECF Doc. 8, p. 9). Furthermore, Respondent asserts that the nunc pro tunc entry did not result in

"a new intervening sentence between his two federal habeas petitions" making the instant Petition second or successive. (*Id.* at p. 12).

On March 11, 2024, this Court issued a no traverse order, stating "No traverse has been filed in this case. The court hereby establishes a final deadline of April 25, 2024 by which petitioner must file a traverse should he wish to respond to the respondent's arguments. Should a traverse not be filed by said date, the court will proceed to consider the writ on the current record." (ECF Doc. 9). On April 15, 2024, Stewart filed a Motion for Extension of Time to file his Traverse and a Motion for Leave to Amend Habeas Petition Pursuant to Rule 15(c)(2) of the Federal Rules of Civil Procedure. (ECF Docs. 10 and 11). I denied the motion to amend to the extent it sought to assert additional grounds for relief, but granted to allow Stewart to amend his petition to encompass only his nunc pro tunc ground for relief on the basis that the instant Petition did not stem from a new intervening judgment. (ECF Doc. 13). In doing so, Stewart's motion for extension of time to file his traverse was denied as moot. (*Id.*).

Stewart did not amend his petition, but rather filed the July 8, 2024 document titled "Reply to Respondent's Return of Writ/Opposition to Magistrate Judge Parker's Order that the Second and Successive Restrictions of 2244(b), Bar his 2254 Petition." (ECF Doc. 14). A review of this document reveals that it is best classified as a traverse in that it responds the argument asserted in the return of writ that the Petition is second or successive and gives clarification as to why Stewart believes the nunc pro tunc does constitute a new judgment. Based upon the substance of the document and the clarification provided by Stewart, the July 8, 2024 filing will be accepted and considered as Stewart's traverse.

Generally speaking, a nunc pro tunc entry is not considered a new judgment because it is a mechanism used by the sentencing court to correct a clerical mistake in its journal entry. "The

phrase 'nunc pro tunc' means 'now for then' and 'refers to situations in which the court's records do not accurately reflect its actions.'" *Crangle v. Kelly*, 838 F.3d 673, 680 (6th Cir. 2016) quoting *Kusay v. United States*, 62 F.3d 192, 193 (7th Cir. 1995). However, the Sixth Circuit has recognized that a nunc pro tunc entry that substantively alters the sentence pursuant to which the petitioner is held in custody may result in exceptions to general habeas rules. For example, in the context of AEDPA's one-year statute of limitations for bringing a habeas petition, the Sixth Circuit has held that a "nunc pro tunc order [that] merely corrected a record to accurately reflect the court's actions . . . would not be a new sentence that resets the statute of limitations under § 2244(d)(1)(A)." *Crangle*, 838 F.3d 673 at 680. However, if it "created a new sentence, it was a new judgment that reset the one-year statute of limitations to file a habeas corpus petition." *Id.*

Further, and relevant to the issue before this Court, when a nunc pro tunc entry "substantially and substantively changes the terms under which an individual is held 'in custody'" that change "creates a new judgment for purposes of the second or successive bar." *In re Stansell*, 828 F.3d 412, 418-19 (6th Cir. 2016), quoting 28 U.S.C. § 2254(a), (b)(1) (holding that a habeas petitioner did not require appellate court approval before filing a second in time habeas petition when the sentencing court issued a nunc pro tunc entry adding a period of post-release control that was not announced at the petitioner's sentencing hearing). When a nunc pro tunc entry is considered a new judgment for purposes of federal habeas review, it "reopens challenges to any aspect of that judgment, whether related to the conviction, the sentence, or both." *In re Stansell*, 828 F.3d 417.

With this in mind, I find that the April 29, 2021 nunc pro tunc entry substantially and substantively altered Stewart's sentence.

29

Stewart moved the sentencing court to "correct sentencing journal entry" arguing in relevant part that, "[a] trial-court's failure to incorporate what occurred at a sentencing hearing into a sentencing journal entry is a 'clerical mistake' that may be corrected by the court through a nunc pro tunc entry to reflect what actually occurred in open court." (ECF Doc. 8-1, p. 264). On April 29, 2021, the court docketed a nunc pro tunc amending Stewart's sentence as follows: "30 y[ea]rs to life" to "life imprisonment with parole eligibility after serving 30 full years of imprisonment." (*Id.* at p. 279). However, the sentence incorporated into the April 29, 2021 nunc pro tunc entry is materially different than the one announced in open court during sentencing. At the sentencing hearing, the court imposed a sentence of "life imprisonment with parole eligibility after 30 years incarceration." (ECF Doc. 14-1, p. 16). The nunc pro tunc "corrected" the sentence to "life imprisonment with parole eligibility after serving 30 *full* years of imprisonment." (ECF Doc 8-1, p. 279) (Emphasis added). The addition of the word "full" appears to be a minor and insubstantial change, however the Ohio Supreme Court has found that the addition of the word "full" via nunc pro tunc to a defendant's sentence for aggravated murder can be a meaningful change. *State ex rel. Davis v. Janas*, 160 Ohio St.3d 187 (Ohio 2020).

In *Janas*, the Ohio Supreme Court explained that the "difference between a sentence of life in prison with parole eligibility after 20 years and life in prison with parole eligibility after 20 full years is the offender's ability to reduce the base sentence by earning certain types of credit." *Id.* at 189. "Sentences in which the offender is eligible for parole after 20 years are subject to diminution for certain types of good behavior and prison-program participation, whereas sentences of life in prison with parole eligibility after 20 full years are not and may be reduced only by the amount of jail-time credit awarded." *Id.*

As, under Ohio law, the addition of the word "full" to Stewart's sentence substantively and substantially alters the sentence pursuant to which he is in custody in that it strips him of the ability to reduce his base sentence by earning certain types of credit, I find that his petition does not require appellate court approval prior to proceeding with habeas review. In proceeding to habeas review, Stewart can challenge "any aspect of that judgment, whether related to the conviction, the sentence, or both." *In re Stansell*, 828 F.3d 417.

### B. Statute of Limitations

Respondent further argues in the Return of Writ that both of Stewart's grounds for relief are time barred by AEDPA's one-year statute of limitations. (ECF Doc. 8, pp. 15-23). Respondent argues that "Stewart's petition for the writ of habeas corpus is more than two decades tardy" in that it relates to his 1997 conviction. However, as discussed above, the April 29, 2021 nunc pro tunc entry was a new judgment and the Sixth Circuit has found that in the instance of a new judgment the one year statute of limitations is reset. *Crangle v. Kelly*, 838 F.3d at 680.

AEDPA provides: "[a] 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2244(d)(1). The statute of limitations period runs from the latest of four possible dates:

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D)     the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Stewart's convictions became final, for purposes of habeas review, on November 14, 2022, 90 days after the Ohio Supreme Court declined to accept jurisdiction of his nunc pro tunc appeal. Thus, absent tolling, Stewart had until November 15, 2023, to file his federal habeas corpus petition; which he filed on November 4, 2023. (ECF Doc. 1).

Therefore, Respondent's argument that the Petition is barred by AEDPA's one-year statute of limitations is not well taken.

### C.     Habeas Review

As will be discussed in more detail below, I find that Stewart fairly presented Ground Two containing his Double Jeopardy issue to the state court for adjudication by raising it both in a direct appeal of the nunc pro tunc entry and to the Ohio Supreme Court. However, I find that Stewart procedurally defaulted Ground One regarding the *Brady* violation.

### 1.     Ground Two: Nunc Pro Tunc and Double Jeopardy

The Fifth Amendment to the United States Constitution guarantees that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb . . . ." U.S. CONST. amend. V. The Double Jeopardy Clause provides criminal defendants with three distinct protections: barring a second prosecution of the defendant for the same offense after acquittal, a second prosecution of the defendant for the same offense after conviction, and multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969), overruled on other grounds, *Alabama v. Smith*, 490 U.S. 794 (1989). Stewart's arguments relate to the third protection – barring multiple punishments for the same offense.

In his second ground for habeas relief, Stewart argues his Fifth Amendment protections against double jeopardy were violated when the sentencing court issued the April 29, 2021 nunc

pro tunc entry without crediting him with time served. (ECF Doc. 1, pp. 25-26). Stewart raised this issue as his second assignment of error on appeal to Ohio's Eighth District Court of Appeals and as his second proposition of law in his memorandum in support of jurisdiction to the Ohio Supreme Court. (ECF Doc. 8-1, pp. 293, 346). Respondent argues "that the state court of appeals' decision rejecting Stewart's arguments is entitled to deference and that the Ohio Department of Rehabilitation and Correction has furnished proof that his claim is meritless[.]" (ECF Doc. 8, p. 40).

In resolving Stewart's assignments of error on appeal in *Stewart II*, the appellate court decision focused its analysis on Stewart's first assignment of error – an issue not raised in the instant Petition. After analyzing and overruling Stewart's first assignment of error, the court summarily overruled his second assignment of error which raised the double jeopardy argument presented in his Petition. (ECF Doc. 8-1 pp. 337-42). However, the summary denial without analysis does not preclude this Court from federal habeas review. "[D]etermining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning." *Harrington v. Richter*, 562 U.S. 86, 98. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Id*.

Therefore, while we do not have an explanation from the Ohio Eighth District Court of Appeals regarding its denial of Stewart's Double Jeopardy assignment of error, Stewart still must demonstrate that there was no reasonable basis for the court of appeals' decision overruling his related assignment of error. I find he has not met this burden.

Included within the attachments to Respondent's return of writ is a what is titled by Respondent as a "Business Record from Bureau of Sentence Computation." (ECF Doc. 8-1, pp. 382-83). A review of this document indicates that it is a letter from Debra Warren ("Warren"), the Correctional Records Sentence Computation Auditor for the Ohio Department of Rehabilitation and Correction. (*Id.* at p. 383). The letter was notarized on February 15, 2024. (*Id.*) In the letter, Warren states that

> Stewart was sentenced on 9/4/1997 for Cuyahoga County case CR340429. He was ordered to serve 3 years on the gun specification for count 1 and 30 full to life for the charge of Aggravated Murder on count 1. He was also sentenced on Count 2 for Attempted Murder 15 to 25 years, counts 3 and 4 Aggravated Robbery 15 to 25 years, counts 5 and 6 Kidnapping 15 to 25 years and count 7 weapons under disability 3 to 5 years. All these counts were ordered consecutive to each other. His aggregate sentence therefore is 3 years for the gun plus 30 full years then 78 years diminished by good time. He was admitted to ODRC on 9/11/1997 and given jail credit for 365 days. His gun term expired on 9/9/2000. His full term will expire on 9/2/2029 and his current board date is 3/26/2084.

(*Id.* at p. 382). Stewart does not challenge this information in his traverse. Based on this information, I find that Stewart has not demonstrated that there was no reasonable basis for the state court to deny him relief because he has not been deprived of credit for time served between his original sentencing on September 4, 1997, and the issuance of the nunc pro tunc on April 29, 2021. I therefore recommend that the District Court deny Stewart's second ground for relief.

### 2.    Ground One: *Brady* Violation

In his first ground for relief, Stewart argues that his Fourteenth Amendment due process rights were violated when the State of Ohio failed to disclose investigative reports that could have been used to impeach witnesses at trial. (ECF Doc. 1-1 p. 18). Respondent argues that this ground "is procedurally defaulted due to [Stewart's] unexcused failures to fairly present it to the Ohio courts." I agree with Respondent and recommend that the District Court dismiss Ground One as procedurally defaulted because Stewart failed to exhaust his state court remedies.

Stewart filed a motion for leave to file a motion for a new trial with the sentencing court on August 15, 2017; the basis of which being the alleged *Brady* material discussed in Ground One. In his petition, Stewart asserted that he learned of the alleged *Brady* material when he submitted a public records request. (ECF Doc 8-1, pp. 164-65). According to Stewart, in November 1999 the Cleveland Police Department turned over detective reports that would have allowed him to impeach various witnesses at trial. (*Id.* at pp. 164-68). When it denied Stewart's motion for leave, the sentencing court stated that Stewart:

> failed to demonstrate by clear and convincing evidence that he was unavoidably prevented from the discovery of the evidence upon which he is relying (i.e. , allegedly exculpatory supplemental police reports relating to the homicide investigation) and that there was no undue delay in filing a motion for new trial. [Stewart] was sentenced on September 4, 1997 and his conviction was affirmed on appeal on November 18, 1998. In 1999, [Stewart] made an Ohio public records request and received the police reports central to the issues here. Even if the supplemental reports contained evidence favorable to the defense and material to his guilt or punishment [Stewart's] request for leave to file a motion for new trial now is unreasonable. [Stewart] was in possession of the supplemental reports on or before April 2001 when that information was referenced and formed the basis for his first petition for post-conviction relief. To seek leave to file a motion for new trial 16 years later is patently unreason able and unsupported by affidavit or other evidence.

(ECF Doc. 8-1, p. 183). Stewart did not appeal the sentencing court's denial.

A petitioner may procedurally default a claim if he or she fails to raise and pursue that claim through the state court's "ordinary appellate review procedures." *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999). If state law no longer allows the petitioner to raise the claim once a petitioner filed a federal habeas petition, then it is procedurally defaulted. *Engle v. Isaac*, 456 U.S. 107, 125 n. 28, (1982); see also *Coleman v. Thompson*, 501 U.S. 722, 731-32, (1991); *Lovins v. Parker*, 712 F.3d 283, 295 (6th Cir. 2013) ("a claim is procedurally defaulted where the petitioner failed to exhaust state court remedies, and the remedies are no longer available at the time the federal petition is filed because of a state procedural rule."). Furthermore, to satisfy the

fair presentation requirement in a federal habeas petition, a constitutional claim for relief must be presented to the state's highest court. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845-48 (1999); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990).

Stewart did not appeal the denial of his post-conviction motion for leave to file a motion for new trial to the state appellate court, much less the Ohio Supreme Court, and can no longer do so. *Nesser v. Wolfe*, 370 Fed.App'x. 665, 670, 2010 WL 1141006, at *4 (6th Cir. 2010) ("Ohio does not permit delayed appeals in post-conviction proceedings, and this is an adequate and independent ground upon which to deny relief."); *State v. Nichols*, 463 N.E.2d 375, 378 (Ohio 1984) ("a delayed appeal pursuant to App.R. 5(A) is not available in the appeal of a postconviction relief determination[.]").

Therefore, I find that Stewart procedurally defaulted this claim by failing to satisfy the fair presentation requirement, and as a result, failed to exhaust his state court remedies.

Despite a finding a of procedural default, a federal habeas court may, in certain circumstances, reach the merits of a procedurally defaulted ground through court-created safety valves. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991). To reach the merits of a procedurally defaulted claim, a petitioner must demonstrate cause and prejudice excusing the default or that there is new evidence that proves a petitioner's actual innocence. *Id.*

In his petition, Stewart argues, as both cause and prejudice, that his procedural default should be excused "because the reason for his failure to raise his Brady claim in State Court was the State's Suppression of the relevant evidence." (ECF Doc. 1-1, p. 21). However, this argument does not address why he did not appeal the decision of the sentencing court denying his motion for leave to file a motion for a new trial when he did discover the allegedly withheld police reports in 2017. Additionally, Stewart has not called the Court's attention to any new evidence

36

that proves his actual innocence. Therefore, because Stewart has not excused his procedural default, I recommend that his first ground be dismissed.

## VIII.  Certificate of Appealability

Under 28 U.S.C. § 2253(c)(1)(A), this Court will grant a certificate of appealability ("COA") for an issue raised in a §2254 habeas petition only if the petitioner has made a substantial showing of the denial of a federal constitutional right. *Cunningham v. Shoop*, 817 F. App'x 223, 224 (6th Cir. 2020). A petitioner satisfies this standard by demonstrating that reasonable jurists "could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (internal quotation marks omitted); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When a claim is denied on procedural grounds, the petitioner must show "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

If the District Court accepts my recommendation, Stewart will not be able to show that reasonable jurists could disagree with the District Court's resolution of his double jeopardy claim. Because the record establishes that Stewart was given credit for the time he served in prison between his 1997 sentencing and the 2021 nunc pro tunc, he cannot demonstrate that he was punished twice for the same offense. Furthermore, the dismissal of his first ground for relief as procedurally defaulted is not debatable among jurists. Stewart did not appeal the alleged *Brady* violation issue and give the state court a fair opportunity to address it. Because jurists of reason would not find debatable the conclusion that Stewart's first ground is procedurally

defaulted, and the default is not excused, I recommend that no certificate of appealability issue in this case.

## IX.    Recommendation

For the above stated reasons, I recommend that Stewart's Petition for a writ of habeas corpus be dismissed as to Ground One and that the Petition be denied as to Ground Two. I further recommend he be denied a certificate of appealability.

Dated: October 16, 2024

Reuben J. Sheperd
United States Magistrate Judge

## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).